1

2

3

4

UNITED STATES DISTRICT COURT

5

NORTHERN DISTRICT OF CALIFORNIA

6

7    JOHN J. RASMUSSEN,                    Case No.  14-cv-01534-PJH   (JSC)

         Plaintiff,
8                                          REPORT AND RECOMMENDATION
         v.                                RE:  MOTION FOR DEFAULT
9                                          JUDGMENT AGAINST DEFENDANTS
                                           RONALD WITT, ANTHONY SALIBA,
10   DUBLIN RARITIES, et al.,              AND DUBLIN RARITIES

         Defendants.
11                                         Re: Dkt. No. 59

12

13         Plaintiff John J. Rasmussen ("Plaintiff"), a serious coin collector, contends that Defendants

14   Anthony Saliba ("Saliba"), Robert Dinardo ("Dinardo"), Ronald Witt ("Witt") along with their

15   corporate entities Dublin Rarities and Centurion Collectables, Inc. ("Centurion," and collectively,

16   "Defendants"), engaged in a scheme to defraud Plaintiff of his savings through a series of

17   misrepresentations involving the sale and exchange of misgraded and overvalued coins.  Plaintiff

18   now moves for default judgment, including actual damages in the amount of $434,500; pre-

19   judgment interest on and a constructive trust in the amount of $425,645; treble damages of

20   $1,303,500; and reasonable attorneys' fees and costs.  (Dkt. No. 59.)  This matter has been

21   referred to the undersigned magistrate judge for a report and recommendation on Plaintiff's

22   motion for default judgment.  Because the Court finds this motion suitable for disposition without

23   oral argument pursuant to Civil Local Rule 7-1(b), the Court VACATES the hearing previously

24   set for January 22, 2015 and therefore DENIES AS MOOT Plaintiff's Motion to Appear by

25   Telephone at that hearing.  (Dkt. No. 68.)  For the following reasons, the Court recommends that

26   Plaintiff's motion for default judgment be GRANTED IN PART in the amount of $589,353.70 as

27   set forth below.

28

*United States District Court*
*Northern District of California*

I.     **BACKGROUND**

   A.     **Allegations of the Complaint**

   Plaintiff is a semi-retired resident of Petaluma who has spent over two decades collecting rare and valuable coins as an investment tool and studying the field of numismatics.[1]  (Dkt. No. 1 ¶¶ 3, 10.)  Defendants are individuals purporting to operate in rare coin sales and exchanges through their businesses, Centurion and later Dublin.  These two businesses are merely the alter egos of the Individual Defendants.[2]  (*Id.* ¶ 46.)

   By February of 2010 Plaintiff had amassed a significant private coin collection (the "Original Collection"), which two reputable coin grading services, Professional Coin Grading Service ("PGCS") and Numismatic Grading Corporation of America ("NGC") had graded—*i.e.*, valued.  (*Id.* ¶ 10.)  Defendants engaged in a scheme to defraud Plaintiff of not less than $434,500 in rare coins and cash over a period of several years.  As will be explained in further detail below, Defendants initially gained his trust by engaging in a proper transaction with appropriately valued coins, then began a campaign to dupe him out of his collection, all the while appearing to assuage his concerns until the end, when they kept Plaintiff's money and coins and offered nothing but silence in return.  This scheme began in 2010.  (*See id.* ¶ 11.)

   1.     Initial Contact

   Dinardo was the first Defendant to make contact with Plaintiff.  In 2010 he cold-called Plaintiff's home representing himself as a rare coin dealer from New York.  (*Id.* ¶ 11.)  Dinardo was working for or as an agent of Centurion at this time.  (*Id.*)  Following this phone call, Dinardo and Plaintiff engaged in a series of small coin Trades.  (*Id.* ¶ 12.)  These Trades "were, from all

---

[1] Numastics is the study or collection of currency, including coins.  *See* http://www.merriam-webster.com/dictionary/numismatics (last visited Jan. 15, 2015).

[2] As grounds for the alter ego relationship, Plaintiff alleges that (1) the Individual Defendants were the majority interest or controlling shareholders; (2) the companies were inadequately capitalized; (3) the Individual Defendants operated the companies as sole proprietorships or partnerships such that the activities of the companies were carried out without complying with corporate formalities; (4) the Individual Defendants operated the companies to with the intent to defraud; and (5) adhering to the fiction of a separate existence would promote fraud and injustice and allow the Individual Defendants to escape the debts of the companies to Plaintiff's detriment.  (Dkt. No. 1 ¶ 46.)

United States District Court
Northern District of California

outward appearance, legitimate, and served to build [Plaintiff's] confidence [in] the defendants' business practices." (*Id.*)  Sometime after these trades with Dinardo, Defendant Saliba contacted Plaintiff, as well, indicating that he worked directly with Dinardo.  (*Id.* ¶ 13.)  Saliba and Dinardo were co-workers and in on the scheme together.  (*Id.*)  Saliba proposed a series of transactions, and Plaintiff entered two:  in the first transaction, Saliba sold Plaintiff three coins for $2,985; in the second, Saliba sold Plaintiff one coin for $5,820.  (*Id.*)  Plaintiff refers to these four coins, along with the early trades with Saliba, as "Bait Coins."  (*Id.*)

The trades with Dinardo and the Bait Coins with Saliba appeared legitimate—*i.e.*, the coins appeared to be properly graded—and served to build Plaintiff's trust and confidence in defendants' business.  (*Id.* ¶¶ 12, 14.)  These initial transactions were meant to "serve[ ] as the ground work for defendants' fraudulent scheme."  (*Id.* ¶ 14.)

### 2.    "Replacement Coins" Exchange

Following the initial transactions involving the alleged Bait Coins, Dinardo began to encourage Plaintiff to buy and/or exchange more rare and valuable coins "through ever larger transactions."  (*Id.* ¶ 15.)  Dinardo's main proposal was for Plaintiff "to exchange [his] entire Original Collection along with some of [his] cash, in a single transaction, for coins of equivalent or greater value that would appreciate in value faster than the Original Collection over time."  (*Id.* ¶ 16.)  Up to and during July of 2010, Dinardo continued to "implore[ ]" Plaintiff to engage in this transaction, "further representing, both expressly and by implication, that defendants would be able to assist Plaintiff in selling coins, as needed, to take advantage of favorable market conditions."  (*Id.* ¶ 16.)  In response to Dinardo's solicitations, he shipped his entire Original Collection to Dinardo in New York and completed a wire transfer of $129,000 from his account to Dinardo's.  (*Id.* ¶ 17.)

Thereafter, Dinardo shipped a set of replacement coins to Plaintiff ("Replacement Coins").  (*Id.* ¶ 18.)  As of December 13, 2010, Dinardo stated that the Replacement Coins had a $434,500 value and were graded by a reputable grading agency.  (*Id.*)  Defendants knew these statements were false and intended to have Plaintiff rely on them as part of their fraud to keep Plaintiff's Original Collection.  (*Id.* ¶ 48.)

3.      Plaintiff's Attempts to Sell and Defendants' Delay Tactics

In April of 2011, Plaintiff contacted Dinardo to inform him that he needed to sell some of the Replacement Coins to generate cash to pay for his daughter's wedding and satisfy his tax obligations.  (*Id.* ¶ 19.)  Dinardo ensured Plaintiff that he would sell the Replacement Coins and send Plaintiff a check within a few months.  (*Id.* ¶ 20.)  Months passed, however, and Plaintiff did not hear from Dinardo.  (*See id.* ¶ 21.)  Between April and October, Plaintiff called and texted Dinardo dozens of times, but Dinardo did not respond.  (*Id.*)  With no word from Dinardo and strained for cash, Plaintiff withdrew funds from his retirement account—incurring transactional costs—to meet his financial obligations.  (*Id.* ¶ 22.)

In November of 2011, Dinardo finally responded, telling Plaintiff that he had buyers in mind for the Replacement Coins.  (*Id.* ¶ 23.)  Plaintiff continued to work with Dinardo to sell the Replacement Coins because Dinardo had insisted on it, representing that he could get higher prices and make the sales faster than any other company.  (*Id.*)  Nevertheless, according to the complaint, Dinardo did not sell the Replacement Coins any time soon.  Instead, on February 24, 2012, Dinardo told Plaintiff that he had a good relationship with several wholesalers and good selling months were approaching, and that Plaintiff would likely need to send Dinardo the Replacement Coins so that Dinardo could sell them himself for cash.  (*Id.* ¶ 24.)

According to Plaintiff, each of the statements about Defendants' efforts to arrange the sale of the Replacement Coins or restore their value were knowingly false when made and intended to have Plaintiff rely on them as part of their fraud to keep Plaintiff's Original Collection.  (*Id.* ¶ 48.)

4.      Plaintiff's Realizations About the Replacement Coins

By April of 2012, the Replacement Coins still had not been sold.  (*See id.* ¶¶ 24-25.)  Plaintiff left messages for Dinardo indicating his belief that the Replacement Coins' value should increase markedly given the increase in the market price of gold and silver.  (*Id.* ¶ 25.)  In light of this understanding, Plaintiff asked Dinardo to at least complete a "test sale" by selling one coin from the Replacement Coins so as to assure Plaintiff that their value had, in fact, increased in accordance with the market.  (*Id.*)

In July of 2012, Plaintiff learned that the Replacement Coins were not actually as valuable

United States District Court
Northern District of California

1    as Dinardo had represented because they were initially graded by disreputable "sham" rating

2    services.  (*Id.* ¶¶ 26-27.)  Plaintiff called Dinardo to express concern about the value of the

3    Replacement Coins.  (*Id.* ¶ 27.)  In response, between July and December of 2012, both Dinardo

4    and Saliba assured Plaintiff that they would re-grade the Replacement Coins or add other coins to

5    bring Plaintiff's collection back to the represented value as of December of 2010.  (*Id.* ¶ 28.)  Such

6    communications took place at least on October 24, 2012; January 29, April 16, May 1 and 14, and

7    December 9, 2013, and were knowingly false when made.  (*Id.* ¶¶ 28, 48.)

                5.    Centurion/Dublin Merger and Continued Misrepresentation

9          While Saliba and Dinardo made repeated assurances, their business, Centurion, merged

10   into Dublin in November of 2012.  (*Id.* ¶ 30.)  Saliba—then an owner, agent, or employee of

11   Dublin—called Plaintiff on December 5, 2012, and told Plaintiff that he was working with

12   Dinardo on Plaintiff's matter and would help increase the value of Plaintiff's collection back to the

13   represented value from December of 2010.  (*Id.* ¶ 31.)

14         Similarly, on January 28 and 29, 2013, respectively, Witt and Saliba each called—

15   purporting to work for Dublin—and told Plaintiff that they would help him recover the December

16   2010 represented value of the Replacement Coins and attempt to accelerate payment to Plaintiff.

17   (*Id.* ¶ 32.)  In April of 2013, Plaintiff faxed to Saliba a chart reflecting the Replacement Coins'

18   2010 represented value.  (*Id.* ¶ 33.)  On April 16, Saliba called to confirm receipt of the fax and

19   reiterated that he would help with the re-grading swap.  (*Id.* ¶ 34.)  These statements about

20   recovering the value of the Coins or effecting a re-grading swap were knowingly false when made

21   and were made as part of Defendants' fraud.  (*Id.* ¶ 48.)  As a show of good faith for their

22   continued business dealings, Saliba asked Plaintiff to buy a roll of quarters at a purportedly

23   discounted price.  (*Id.* ¶ 35.)  Plaintiff agreed, and paid $1,000 for the roll.  (*Id.*)

24         Finally, on May 1, 2013, Saliba called Plaintiff and said that he had a client willing to

25   exchange coin collections with Plaintiff.  (*Id.* ¶ 36.)  Saliba asked Plaintiff to ship the Replacement

26   Coins to him, and that, if for any reason the sale with this client did not go through, Dublin would

27   re-grade the Replacement Coins and return their December 2010 represented value to Plaintiff, as

28   they had earlier agreed.  (*Id.*)  Again, these statements were false when made, and Defendants

                                    5

never intended to go through with a sale or return any value to Plaintiff. (*Id.* ¶ 48.) As instructed, Plaintiff shipped the Replacement Coins to Saliba at Dublin's address the very next day. (*Id.* ¶ 37.)

On May 14, 2013, after receiving the Replacement Coins, Saliba called Plaintiff again and shared his belief that many of the Replacement Coins were actually one or two rating grades below the value printed on the labels that accompanied the coins. (*Id.* ¶ 38.) Saliba reiterated that he would look for other coins to restore the represented December 2010 value of the Replacement Coin collection and would provide coins from his personal collection, if needed, to make Plaintiff whole. (*Id.* ¶ 39.)

### 6.   Final Attempts at Out-of-Court Resolution

Following that May telephone call, however, Plaintiff heard nothing from Defendants until December, with the exception of a package containing four lower-graded coins that Saliba shipped to Plaintiff on July 16, 2013. (*Id.*) In December of 2013, after months of silence, Plaintiff contacted Saliba and Dinardo via telephone and email to inquire about his Replacement Coins, which Dublin had been holding since May 3, 2013. (*Id.* ¶ 40.) In an email on December 9, 2013, Saliba responded via email, reassuring Plaintiff that he "will in no way be losing [his] collection" and that the two would speak soon. (*Id.* ¶ 41 & Ex. A.)

Dinardo called Plaintiff on or about February 7, 2014, reiterating that Plaintiff's Replacement Coins were secure in Dublin's safe. (*Id.* ¶ 42.) On that call, however, Dinardo stated that he still believed the Replacement Coins were fairly graded and worth the value that he initially represented in December of 2010. (*Id.*)

On February 27, 2014—seven months after sending his Replacement Coins to Dublin to be exchanged or sold to recoup their value as Defendants promised—Plaintiff sent a final demand letter to Defendants demanding that they promptly provide him with either coins or cash to restore his property. (*Id.* ¶ 43 & Ex. B.) As of the filing of the complaint, Defendants had not responded to this final demand letter and continued to hold Plaintiff's coins and money. (*Id.* ¶¶ 43-44.) Defendants may have sold, traded, or otherwise disposed of his coins or are seeking to do so now, and have no intent to remit to Plaintiff the proceeds of such transactions. (*Id.* ¶ 44.)

6

United States District Court
Northern District of California

### B.    Procedural History

Met with silence after sending his final notice to Defendants, Plaintiff filed the instant eleven-count complaint on April 2, 2014.  (Dkt. No. 1.)  Plaintiff brings a number of common law claims against all Defendants, including intentional misrepresentation (*id.* ¶¶ 47-54), negligent misrepresentation (*id.* ¶¶ 55-61), fraud (*id.* ¶¶ 62-71), conversion (*id.* ¶¶ 72-76), unjust enrichment (*id.* ¶¶ 77-81), money had and received (*id.* ¶¶ 82-84), and breach of contract (*id.* ¶¶ 85-92), and seeks a constructive trust to recover his money and property (*id.* ¶¶ 93-94).  In addition, Plaintiff alleges that Defendants' conduct constitutes an enterprise through a pattern of racketeering activity in violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961-1968 (*id.* ¶¶ 95-108) and conspiracy to commit a RICO violation (*id.* ¶¶ 109-115).  Finally, Plaintiff alleges that Defendants' conduct constitutes unfair competition in violation of California Business and Professions Code § 17200.  (*Id.* ¶¶ 116-121.)

Plaintiff properly served the summons and complaint on Defendants Witt, Saliba, and Dublin (via its president, Witt) on April 24, 2014 (Dkt. Nos. 10-12), but was unable to locate Dinardo and Centurion to effect service.  (Dkt. No. 59-2 ¶6.)  Dublin never made an appearance in this matter and failed to answer or otherwise respond to the complaint within the time prescribed by the Federal Rules of Civil Procedure, so the Clerk of Court entered Dublin's default on June 17, 2014.  (Dkt. No. 14.)  As for Witt and Saliba, the process was not as simple:  according to Plaintiff's counsel, an attorney returned waivers of service on behalf of both individuals.  (Dkt. No. 59-2 ¶ 7.)  The attorney entered an appearance solely for Witt; Saliba never appeared.  (*See* Dkt. No. 16.)  Saliba failed to timely answer or otherwise file a responsive pleading, and the Clerk entered his default on July 8, 2014.  (Dkt. No. 29.)  Witt, on the other hand, began to litigate this case, filing a motion to dismiss for failure to state a claim upon which relief may be granted.  (Dkt. No. 18.)  However, after the Court denied the motion (Dkt. No. 57), Witt failed to answer the complaint or otherwise defend himself in this action.  The Clerk, in turn, entered his default on September 3, 2014.  (Dkt. No. 50.)  Given their waivers of service and appearances in this matter, Plaintiff sent letters to Witt (through his attorney of record) and Saliba (at the offices of Dublin Rarities) regarding the Clerk's entries of default and the pending motion for default judgment on

January 9, 2015.  (Dkt. No. 67 at 4-6.)  Nevertheless, since their defaults were entered, Witt, Saliba, and Dublin have not made any attempt to cure default or otherwise defend this action.

In the meantime, Plaintiff continued his efforts to serve the remaining defendants, Dinardo and Centurion.  Having failed to locate and serve these defendants despite months of diligence, the Court granted Plaintiff's motion for service by publication of Dinardo and Centurion.  (*See* Dkt. No. 58.)  Plaintiff completed service by publication on December 11, 2014 (*see* Dkt. No. 64 at 2), and neither Dinardo nor Centurion timely answered or otherwise responded to the complaint.  As a result, the Clerk entered their default on January 15, 2015.  (Dkt. No. 65.)

Plaintiff filed the instant motion for default on December 1, 2014.  (Dkt. No. 59.)  In the motion, Plaintiff seeks judgment in its favor on each of the eleven claims for relief.  With respect to the common law claims, Plaintiff seeks actual damages of $434,500—five hundred dollars less than the amount pleaded in the complaint.  (Dkt. No. 59 at 28.)  In addition, Plaintiff seeks a constructive trust in the amount of $425,645, representing the $296,645 value of the coins or proceeds in his Original Collection along with the $129,000 that he sent via wire transfer to Defendants.  (*Id.*)

## II.    DEFAULT JUDGMENT

After entry of default, a court may grant default judgment on the merits of the case.  *See* Fed. R. Civ. P. 55.  "The district court's decision whether to enter a default judgment is a discretionary one."  *Aldabe v. Aldabe*, 616 F.2d 1089, 1092 (9th Cir. 1980).  Courts consider the following factors in determining whether to enter default judgment:

> (1) the possibility of prejudice to the plaintiff, (2) the merits of plaintiff's substantive claim, (3) the sufficiency of the complaint, (4) the sum of money at stake in the action; (5) the possibility of a dispute concerning material facts; (6) whether the default was due to excusable neglect, and (7) the strong policy underlying the Federal Rules of Civil Procedure favoring decisions on the merits.

*Eitel v. McCool*, 782 F.2d 1470, 1471-72 (9th Cir. 1986).  Upon entry of default, the factual allegations of the complaint related to liability are deemed to have been admitted by the non-defaulting party.  *TeleVideo Sys., Inc. v. Heidenthal*, 826 F.2d 915, 917-18 (9th Cir. 1987).  Allegations regarding damages, however, are not deemed admitted; to that end, the Court has the

United States District Court
Northern District of California

8

1  discretion to consider competent evidence and other papers submitted with a motion for default

2  judgment to determine damages. *Shanghai Automation Instrument Co., Ltd. v. Kuei*, 194 F. Supp.

3  2d 995, 1000, 1010 (N.D. Cal. 2001) (citing *TeleVideo Sys., Inc.,* 826 F.2d at 917).

4      The majority of the *Eitel* factors support default judgment in this case.

5      **1.      Possibility of Prejudice**

6      The first *Eitel* factor considers whether the plaintiff will suffer prejudice if a default

7  judgment is not entered. *Craigslist, Inc. v. Naturemarket, Inc.*, 694 F. Supp. 2d 1039, 1054 (N.D.

8  Cal. 2010). Here, Plaintiff would suffer prejudice if default judgment were not entered because he

9  would be left without any other course of action to recover the value of his loss. "Denying a

10  plaintiff a means of recourse is by itself sufficient to meet the burden posed by this factor."

11  *Willamette Green Innovation Ctr., LLC v. Quartis Capital Partners*, No.13-cv-00848-JCS, 2014

12  WL 5281039, at *6 (N.D. Cal. Jan. 21, 2014) (citations omitted). Other courts have found that the

13  possibility of prejudice weighs in favor of default in situations where, as here, plaintiff seeks

14  judgment to begin collecting the value of money lost due to fraud. *See, e.g.*, *id.* at *6 (finding that

15  plaintiff in breach of contract, fraud, and money had and received action would be prejudiced

16  because it would be without recourse to recover a fraudulent loan if default judgment were not

17  entered in its favor); *Triumph Furniture Processing-Export Joint Stock Co. v. Everest Furniture*

18  *Co.*, No. 13-cv-01729 NC, 2013 WL 9600372, at *3 (N.D. Cal. Aug. 29, 2013) (finding that

19  plaintiff in breach of contract and fraud action would be prejudiced because they would be without

20  recourse to recover the value of the items shipped to defendant if judgment were not entered in its

21  favor).

22      In this case, the prejudice is similarly evident. Although Defendant Dublin's president

23  personally received service of the complaint in this action, making it clear beyond cavil that this

24  Defendant had actual notice of this action, Dublin has not made an appearance in this matter or

25  responded to the complaint in any way. (*See* Dkt. No. 10; Dkt. No. 59-2 ¶ 6.) Defendant Saliba

26  waived service, but likewise failed to appear or otherwise respond to the allegations in the

27  complaint. (*See* Dkt. No. 29; Dkt. No. 59-2 ¶ 7.) Likewise, while Defendant Witt initially

28  appeared in this matter and, shortly thereafter, filed a motion to dismiss the complaint (Dkt. Nos.

United States District Court
Northern District of California

16, 18), he failed to answer the complaint after the Court denied that motion to dismiss.  (*See* Dkt. No. 47; Dkt. No. 59-2 ¶ 8.)  These Defendants have neither moved to vacate the Clerk's entry of default nor filed an opposition to the instant motion for default judgment.  Defendants have not given the Court any indication that they intend to do so.

Notably, the instant motion for default pertains to only three of the five defendants in this case.  In cases involving requests for default judgment against fewer than all of the defendants in a single action, the Supreme Court has long held that a court should not enter default judgment which is or is likely to be inconsistent with a judgment on the merits as to any answering defendants.  *See Frow v. De La Vega*, 82 U.S. 552, 554 (1872).  Under *Frow*, "where a complaint alleges that defendants are jointly and severally liable and one of them defaults, judgment should not be entered against the defaulting defendant until the matter has been adjudicated with regard to all defendants."  *In re First T.D. & Inv., Inc.*, 253 F.3d 520, 532 (9th Cir. 2001).  The Ninth Circuit has extended *Frow* to caution against default judgment against some but not all defendants where multiple defendants answering the same complaint have closely related defenses or are otherwise "similarly situated" even if not jointly and severally liable.  *Id.*; *see also Shanghai Automation Instrument Co., Ltd. v. Kuei*, 194 F. Supp. 2d 995, 1006-07 (N.D. Cal. 2001) (collecting cases).  This rule is meant to prevent inconsistent judgments between the defaulting defendants and the non-defaulting defendants.  *See In re First T.D.*, 253 F.3d at 532.  The key question to determine if default is proper is whether the facts and theories of the case require uniformity of liability.  *Shanghai Automation Instrument Co.*, 194 F. Supp. 2d at 1008-09.  Where such uniformity is required, then the Ninth Circuit further instructs that if the answering defendants prevail, the action should be dismissed against both answering and defaulting defendants to avoid an "incongruous and unfair" result.  *In re First T.D.*, 253 F.3d at 532.

Here, however, judgment against the two remaining defendants—Dinardo and Centurion— is unlikely to be inconsistent with the defendants subject to this motion.  Indeed, Plaintiff completed Court-ordered service by publication on Dinardo and Centurion on December 11, 2014.  (*See* Dkt. No. 62.)  These defendants have failed to file an answer or other responsive pleading within the time period that the Federal Rules of Civil Procedure proscribe, and Plaintiff filed an

United States District Court
Northern District of California

1    application with the Clerk's Office seeking entry of default against Dinardo and Centurion.  (Dkt.

2    No. 64.)

3          Thus, this factor weighs strongly in favor of default judgment.

4          **2.      Merits of Plaintiff's Substantive Claims**

5          The second *Eitel* factor considers the substantive merits of the plaintiff's claims and the

6    sufficiency of the pleadings to support those claims.  Here, Defendants did not timely file an

7    answer to Plaintiff's complaint, so the Court accepts as true Plaintiff's well-pleaded allegations

8    regarding liability.  *See TeleVideo Sys., Inc. v. Heidenthal*, 826 F.2d 915, 917 (9th Cir. 1987); Fed.

9    R. Civ. P. 8(b)(6).  Nevertheless, "necessary facts not contained in the pleadings, and claims

10   which are legally insufficient, are not established by default."  *Cripps v. Life Ins. Co. of No. Am.*,

11   980 F.2d 1261, 1267 (9th Cir. 1992).  For that reason, default does not automatically entitle a

12   plaintiff to judgment.  Instead, default may be inappropriate under this second *Eitel* factor where

13   the court determines that no justifiable claim has been alleged.  *Draper v. Coombs*, 792 F.2d 915,

14   924 (9th Cir. 1986).

15         Applying the standard set forth in *Draper*, and with respect to each claim for relief asserted

16   in the complaint, the Court concludes that Plaintiff has properly pled actions for intentional

17   misrepresentation (fraud) and negligent misrepresentation, breach of contract, conversion, and

18   unfair business practices, but has not properly pled claims for a civil RICO violation, conspiracy

19   to commit a RICO violation, constructive trust, money had and received, or unjust enrichment.

20   While the undersigned's conclusion that several of these claims are not properly pled may at first

21   glance appear to conflict with the district court's earlier order denying Defendant Witt's motion to

22   dismiss the complaint for failure to state a claim (Dkt. No. 47), such is not the case.  The district

23   court issued a one-paragraph order denying Witt's motion to dismiss for the reasons stated on the

24   record at the hearing.  (*Id.*)  As the hearing transcript makes clear, however, the Court construed

25   Witt's motion narrowly as challenging the sufficiency of the fraud claim as against Witt alone—in

26   other words, the Court addressed only whether the complaint sufficiently alleged Witt's

27   involvement in a scheme to defraud Plaintiff.  (Dkt. No. 48 at 6-10; *see also id.* at 10 ("It's

28   probably not the most detailed complaint . . . with respect to the fraud cause of action, but [ ] read

United States District Court
Northern District of California

11

1   as a whole, it's sufficient to establish personal involvement on the part of Mr. Witt and to raise

2   substantial questions as to any vicarious liability he might have as well.  Motion to dismiss is

3   denied.").)  As set forth below, the undersigned similarly concludes that the complaint has stated a

4   fraud claim—among others—against Witt.  By contrast, at the hearing the district court did not

5   address any other causes of action, including those that the undersigned now concludes fail to state

6   a claim upon which relief can be granted as against all Defendants.  (*See id.*)  Therefore, the

7   undersigned's conclusion on the sufficiency of the complaint squares with the district court's

8   earlier order.

9           Thus, this factor weighs in favor of granting default judgment on the properly pled claims,

10  and it weighs against granting default judgment on the improperly pled claims.

        a.      Intentional Misrepresentation & Fraud

12          To determine if the elements of common law claims have been pleaded sufficiently to state

13  a claim for relief, district courts look to state law.  *Kearns v. Ford Motor Co.*, 567 F.3d 1120, 1126

14  (9th Cir. 2009) (citation omitted).  In California, the elements of claims for intentional

15  misrepresentation and fraud are identical.  *See Mitsui O.S.K. Lines, Ltd. v. SeaMaster Logistics,*

16  *Inc.*, 913 F. Supp. 2d 780, 786 (N.D. Cal. 2012) (describing "the elements of intentional

17  misrepresentation (that is, fraud)").  In order to state a claim for fraud, a plaintiff must plausibly

18  allege the following elements:  "(1) a misrepresentation (false representation, concealment, or

19  nondisclosure); (2) knowledge or falsity (scienter); (3) intent to defraud, *i.e.*, to induce reliance;

20  (4) justifiable reliance; and (5) resulting damage."  *Robinson Helicopter Co. v. Dana Corp.*, 34

21  Cal. 4th 979, 990 (Cal. 2004) (citation omitted).  Notably, "[w]hile a federal court will examine

22  state law to determine whether the elements of fraud have been pled sufficiently to state a cause of

23  action, the [Federal Rule of Civil Procedure] 9(b) requirement that the circumstances of the fraud

24  must be stated with particularity is a federally imposed rule."  *Vess v. Ciba-Geigy Corp. USA*, 317

25  F.3d 1097, 1102 (9th Cir. 2003) (internal quotation marks and citation omitted).  Rule 9(b)

26  requires that a complaint "differentiate [ ] allegations when suing more than one defendant . . . and

27  inform each defendant separately of the allegations surrounding his alleged participation in the

28  fraud."  *Swartz v. KPMG LLP*, 476 F.3d 756, 764-65 (9th Cir. 2007) (internal quotation marks and

United States District Court
Northern District of California

1   citation omitted); *see also Moore v. Kayport Package Express, Inc.*, 885 F.2d 531, 541 (9th Cir.

2   1989) (noting that, in the context of a fraud suit involving multiple defendants, a plaintiff must, at

3   a minimum, "identif[y] the role of [each] defendant[ ] in the alleged fraudulent scheme").

4   However, in a fraud involving multiple defendants, so long as the Plaintiff has pleaded their

5   involvement in a conspiracy, then all participants in the scheme to defraud are "jointly liable for

6   the acts of their co-conspirators." *De La Torre v. Icenhower*, No. 09cv01161 BTM(BLM), 2010

7   WL 2925690, at *3 (S.D. Cal. July 22, 2010) (citation omitted).  This rule applies even for those

8   participants who enter the scheme late. *Indus. Bldg. Materials v. Interchem. Corp.*, 437 F.2d

9   1336, 1343 (9th Cir. 1971) ("One who enters a conspiracy late, with knowledge of what has gone

10   before, and with the intent to pursue the same objective, may be charged with preceding acts in

11   furtherance of the conspiracy.").

12         Here, Plaintiff has alleged that all of the defendants were engaged in a conspiracy to

13   defraud him of his coins.  (*See, e.g.*, Dkt. No. 1 ¶49 (alleging that the representations made to

14   Plaintiff were "part of an *orchestrated scheme* to defraud Plaintiff" (emphasis added)).)  He has

15   identified particular actions of each defendant that were part of the conspiracy.  (*See, e.g.*, *id.* ¶¶ 36

16   (Saliba),  23 (Dinardo), 32 (Witt).)  With respect to each element, the complaint identifies

17   numerous misrepresentations made by all three Individual Defendants and has alleged that they

18   were knowingly false when made (*id.* ¶¶ 49-50); that these misrepresentations were made in order

19   to induce reliance—*i.e.*, to induce Plaintiff to tender his coins and cash to Defendants (*id.* ¶ 51);

20   that Plaintiff's reliance was justified given the Bait Coin transactions that Defendants had arranged

21   in order to boost Plaintiff's confidence in them (*id.*); and that he was damaged as a result of the

22   fraud by losing property and cash consisting of the Original Collection, cost of the Bait Coins, the

23   Wire Transfer, and the Replacement Coins.

24         The same result follows for the corporate entities that plaintiff pleads are the alter egos of

25   the Individual Defendants.  To properly plead an alter ego cause of action, a plaintiff must plead

26   the elements of alter ego and factors in support of those elements.  *Wady v. Provident Life &*

27   *Accident Ins. Co. of Am.*, 216 F. Supp. 2d 1060, 1066 (C.D. Cal. Apr. 30, 2002) (citation omitted).

28   These elements require "(1) that there be such unity of interest and ownership that the separate

United States District Court
Northern District of California

personalities of the corporation and the individual no longer exist and (2) that, if the acts are treated as those of the corporation alone, an inequitable result will follow." *Bauman v. DaimlerChrysler Corp.*, 644 F.3d 909, 920 (9th Cir. 2011) (citing *Doe v. Unocal Corp.*, 248 F.3d 915 (9th Cir. 2001)).  The Court may rely on the following factors to establish a unity of interest: commingling of funds, identification of the equitable owners with domination and control of the two entities, instrumentality or conduit for a single venture or the business of an individual, failure to maintain minutes or adequate corporate records, use of the same office or business locations, identical equitable ownership of the two entities, use of a corporation as a mere shell, and the failure to adequately capitalize a corporation.  *Id.*  "Some courts have held that the pleading of at least two factors in support of a unity interest satisfies this element."  *Daewoo Elecs. Am. Inc. v. Opta Corp.*, No. C 13-1247 JSW, 2013 WL 3877596, at *5 (N. D. Cal. July 25, 2013) (citation omitted).

Here, Plaintiff alleges several factors in support of the first "unity of interest" prong.  First, they have alleged that the Individual Defendants exercised domination and control over Centurion and Dublin insofar as the Individual Defendants "collectively, controlled and operated" and "were the majority interest or controlling shareholders" in both entities.  (Dkt. No. 1 ¶ 46.)  This is enough to meet the "unity of interest" prong.  *See, e.g.*, *Daewoo*, 2013 WL 3877596, at *5.  With respect to the second prong, "California courts generally require evidence of some bad-faith conduct to fulfill the second prong of alter-ego liability, [and] that bad faith must make it inequitable to recognize the corporate form."  *Smith v. Simmons*, 638 F. Supp. 2d 1180, 1192 (E.D. Cal. June 23, 2009) (noting that California courts generally require some evidence of bad faith before concluding that an inequitable result justifies an alter ego finding).  Plaintiff's complaint is replete with alleged facts demonstrating bad faith conduct on the part of Defendants, and that leaving Plaintiff without recourse to recover his debts from all defendants would result in an inequitable result.  Thus, Plaintiff has adequately pleaded his claims as against the Corporate Defendants, as well.

Accordingly, based on the allegations set forth in the complaint, Plaintiff has sufficiently

United States District Court
Northern District of California

1    stated a claim for fraud and intentional misrepresentation, which are one and the same.[3]

2            c.    Conversion

3            Conversion is "the wrongful exercise of dominion over the property of another." *Mindys*

4    *Cosmetics, Inc. v. Dakar*, 611 F.3d 590, 601 (9th Cir. 2010) (quoting *Oakdale Vill. Grp. v. Fong*,

5    43 Cal. App. 4th 539, 543 (1996). The elements of conversion under California law are (1)

6    ownership of, or a right to possess, the property at the time of the conversion; (2) the defendant's

7    conversion by a wrongful act or disposition of the plaintiff's property rights; and (3) damages.

8    *Farmers Ins. Exch. v. Zerin*, 53 Cal. App. 4th 445, 451 (1997). Conversion may be found even

9    when a plaintiff voluntarily places his property in the defendant's possession, so long as the

10   defendant wrongfully "assume[s] control over the property or . . . has applies the property to his

11   own use." *Mindys Cosmetics*, 611 F.3d at 601 (citation omitted). In other words, a plaintiff in a

12   conversion action must prove that, at a certain point, "it did not consent to the defendant's exercise

13   of dominion" over the property. *Bank of NY v. Fremont Gen. Corp.*, 523 F.3d 902, 914 (9th Cir.

14   2008) (citation omitted).

15           A claim for conversion can arise out of either tangible property or money, provided that

16   there is a "specific, identifiable sum involved." *McKell v. Wash. Mut. Inc.*, 142 Cal. App. 4th

17   1457, 1461 (2006). It is well established that a claim for conversion may be stated "when there is

18   a special relationship between the parties where the defendant has a duty to retain or apply funds

19   on the plaintiff's behalf." *Williamson v. Reinalt-Thomas Corp.*, No. 5:11-cv-03548-LHK, 2012

20

21   ───────────────────────
     [3] Plaintiff also asserted a cause of action for negligent misrepresentation against all Defendants
22   arising from the same facts. "The elements of a claim for negligent misrepresentation are identical
     to those for intentional misrepresentation, except that a defendant charged with negligence
23   misrepresentation need not know that [ ] the representation made was false." *Countrywide Home
     Loans, Inc. v. America's Wholesale Lender, Inc.*, No. SACV 12-00242 CJC (ANX), 2014 WL
24   545841, at *4 n.3 (C.D. Cal. Feb. 7, 2014). For negligent misrepresentation, however, "it is
     enough that regardless of the defendant's actual belief, the misrepresentation was made without
25   any reasonable grounds for the defendant's believing in its truth." *Id.* (citing *Platt Elec. Supply,
     Inc. v. EOFF Elec., Inc.*, 522 F.3d 1049, 1051 (9th Cir. 2008)). Having already found that the
26   complaint alleges sufficient facts to demonstrate that Defendants knew their statements, among
     others, about the value of the Replacement Coins and the existence of an available buyer were
27   false with regards to the intentional misrepresentation claim, it is undisputed that Defendants had
     no reason to believe the value was as stated or that a buyer was, in fact, available. Thus, Plaintiff
28   has also sufficiently stated a claim for negligent misrepresentation so default judgment is
     appropriate as to this claim, as well. *See, e.g.*, *Countrywide*, 2014 WL 545851, at *4 n.3.

United States District Court
Northern District of California

United States District Court
Northern District of California

WL 1438812, at *4 (N.D. Cal. Apr. 25, 2012) (citations omitted); *see Fischer v. Machado*, 50 Cal. App. 4th 1069, 1072 (1996) (holding that when an agent is required to turn over to a principal a definite sum of money, the remedy of conversion is proper).  Moreover, "[w]here the conversion is the result of the acts of several persons, which, though separately committed, all tend to the same end, there is joint conversion." *Mindys Cosmetics*, 611 F.3d at 601 (citing *McCafferty v. Gilbank*, 249 Cal. App. 2d 569, 576 (1967)).

        In the complaint, with respect to the first element of conversion, Plaintiff alleges that he had a possessory interest in the represented December 2010 value of the Replacement Coins, which was represented to be equal to the value of Plaintiff's Original Collection, the wire transfer of cash, and the Bait Coins that Plaintiff purchased.  Plaintiff has further alleged that he demanded that Defendants either sell the collection at the represented December 2010 value or return the value to him in cash.  (*Id.* ¶ 43.)  Defendants have retained Plaintiff's property without complying with his demands, which required them to turn over a sum certain, which is sufficient to state a claim for conversion.  *See Fischer*, 50 Cal. App. 4th at 1072.  Moreover, the claim lies against each Defendant under the Ninth Circuit's explanation of "joint conversion" given that Plaintiff has alleged that the acts of each Defendant contributed to the conversion.  *See Mindys Cosmetics*, 611 F.3d at 601.

        These allegations adequately support a claim for conversion.

                    d.    Unjust Enrichment

        Next, Plaintiff brings a cause of action for unjust enrichment.  (Dkt. No. 1 ¶¶ 77-81.)  However, "[n]otwithstanding earlier cases suggesting the existence of a separate, stand-alone cause of action for unjust enrichment, the California Court of Appeals has recently clarified that '[u]njust enrichment is not a cause of action, just a restitution claim.'" *Sprint Nextel Corp. v. Thuc Ngo*, No. C-12-02764 CW (EDL), 2012 WL 4127296, at *7 (N.D. Cal. Sept. 18, 2012) (quoting *Hill v. Roll Int'l Corp.*, 195 Cal. App. 4th 1295, 1307 (2011)).  Given this recent persuasive authority from California state courts, courts in this District have concluded that "there is no cause of action for unjust enrichment under California law." *Sprint Nextel Corp.*, 2012 WL 4127296, at *7 (collecting cases); *Williamson*, 2012 WL 1438812, at *4 (same).  Accordingly, Plaintiff's

1   unjust enrichment claim does not properly state a stand-alone cause of action for unjust

2   enrichment and must be dismissed.  *See Levine v. Blue Shield of Cal.*, 189 Cal. App. 4th 1117,

3   1138 (2010).

4                           e.     Money Had and Received

5          Plaintiff's complaint also includes a cause of action for money had and received.  (Dkt. No.

6   1 ¶¶ 82-84.)  "A claim for money had and received quite simply arises in equity when 'the

7   defendant is indebted to the plaintiff in a certain sum for money had and received by the defendant

8   for the use of the plaintiff.'"  *Fireman's Fund Ins. Co. v. Commerce & Indus. Ins. Co.*, C-98-

9   1060VRW, 2000 WL 1721080, at *8 (N.D. Cal. Nov. 7, 2000) (quoting *Schultz v. Harney*, 27 Cal.

10  App. 4th 1611, 1623 (1994), and *Pike v. Zadig*, 171 Cal. 273, 275–276 (1915)).  The elements of a

11  cause of action for money had and received are: (1) the defendant received money, (2) the money

12  received by the defendant was for the use of the plaintiff, and (3) the defendant is indebted to the

13  plaintiff.  *Fireman's Fund,* 2000 WL 1721080, at *8 (citation omitted).

14         "[M]oney had and received is a common count which, under California law, is not a

15  specific claim but is instead a form of pleading used to aver the existence of monetary

16  indebtedness."  *Mar Partners 1, LLC v. Am. Home Mortg. Servicing, Inc.*, C 10-02906 WHA,

17  2011 WL 11501, at *4 (N.D. Cal. Jan. 4, 2011).  When a common count seeks the same recovery

18  as that sought in a specific claim and is based in the same facts, "it does not survive if the

19  underlying claim does not survive."  *Id.* (quoting *McBride v. Boughton*, 123 Cal. App. 4th 379,

20  394 (2004)) (some citations omitted).  However, "an action for money had and received is based

21  on the existence of a quasi-contract," and "[a]n action in quasi-contract . . . does not lie when an

22  enforceable, binding agreement exists defining the rights of the parties."  *Id.* (citing *Pollak v.*

23  *Staunton*, 210 Cal. 656, 665 (1930), and *Paracor Fin., Inc. v. Gen. Elec. Capital Corp.*, 96 F.3d

24  1151, 1167 (9th Cir. 1996)).

25         Here, Plaintiff's money had and received count seeks the same relief and is based on the

26  same facts as its fraud, conversion, and breach of contract claims.  Because this claim is therefore

27  duplicative of these other claims, the Court declines to enter default as to this count.  *See, e.g.*,

28  *Willamette Green Innovation*, 2014 WL 5281039, at *8 (recommending that the court decline to

United States District Court
Northern District of California

17

1  enter default judgment on a money had and received claim where it was duplicative of a breach of

2  contract claim).  Therefore the Court does not recommend a judgment for money had and received

3  against any of the Defendants.

4  f.  <u>Breach of Contract</u>

5  In California, the elements of a cause of action for breach of contract are: (1) the existence

6  of the contract; (2) performance by the plaintiff or excuse for nonperformance; (3) breach by the

7  defendant; and (4) damages.  *First Commercial Mortg. Co. v. Reece*, 89 Cal. App. 4th 731, 745

8  (2001).  The essential elements of a contract are defined by statute:  (a) parties capable of

9  contracting; (b) their consent; (c) lawful object; and (d) sufficient cause or consideration.  Cal.

10  Civ. Code § 1550.  Provided that the statute of frauds does not apply, a contract may be formed

11  orally, implied through the parties' conduct, or both.  *See Davoodi v. Imani*, No. C 11-0260 SBA,

12  2011 WL 250392, at *3 (N.D. Cal. Jan. 26, 2011) ("An oral contract claim is based on oral

13  representations, while an implied contract claim is predicated on the promisor's conduct.");

14  *Eurodrip, USA, Inc. v. B&B Drip Irrigation, Inc.*, No. 1:09-cv-00716-AWI-SMS, 2009 WL

15  2365845, at *3 (E.D. Cal. July 31, 2009) (granting default judgment on plaintiff's breach of

16  contract claim premised on allegations of a "partial oral and partial written agreement").  At

17  bottom, and whatever type of agreement is alleged, "[c]ontract formation . . . requires that the

18  parties[ ] reach mutual assent or consent on definite or complete terms[,]" and this "[m]utual

19  assent is accomplished when a specific offer is communicated to the offeree, and an acceptance is

20  subsequently communicated to the offeror."  *Am. Gen. Life & Acc. Ins. Co. v. Findley*, CV 12–

21  01753 MMM PSWx, 2013 WL 1120662, at *11 (C.D. Cal. Mar. 15, 2013) (quoting *Netbula, LLC

22  v. BindView Dev. Corp.*, 516 F. Supp. 2d 1137, 1155 (N.D. Cal. 2007)).

23  Here, Plaintiff has alleged that the parties reached an agreement to the following terms:

24  Plaintiff was to send Defendants the Original Collection and a Wire Transfer in exchange for

25  Defendants' promise to tender to Plaintiff reputably graded coins of reasonably equal or greater

26  value that would appreciate in value faster than the Original Collection.  (Dkt. No. 1 ¶ 86.)

27  Plaintiff has pointed to specific "conversations, writings[,] and conduct" between the parties that

28  evidence such an agreement.  (*Id.*)  In short, Dinardo made an offer, and Plaintiff accepted it by

United States District Court
Northern District of California

shipping the Original Collection and wiring the money; the terms were definite and complete insofar as the parties' obligations were clear.  Thus, the Court concludes that the parties entered a contract.  *See Findley*, 2013 WL 1120662, at *11.[4]  Moreover, the allegations in the complaint make clear beyond cavil that, while Plaintiff lived up to his end of the bargain, Defendants did not: Plaintiff shipped the Original Collection and sent the Wire Transfer to Defendants; but, while Defendants sent some coins to Defendant, the coins were not "reputably graded" or "of reasonably equal or greater value" than those in the Original Collection.  Moreover, instead of curing this breach, Defendants made matters worse by failing to arrange for the sale of the collection or otherwise returning the value to Plaintiff.  These allegations sufficiently allege breach of contract. *See First Commercial Mortg. Co.*, 89 Cal. App. 4th at 745.

Notably, based on the allegations in the complaint, it was Dinardo alone who entered into this contract with Plaintiff.  (*See id.*)  Notwithstanding that Dinardo was the only party, based on the alter ego allegations in the complaint, as discussed above, the Court recommends entering judgment against all Defendants as to this claim, as well.  *See Field Turf Builders, LLC v. FieldTurf USA, Inc.*, Civ. No. 09-671-HA, 2010 WL 817628, at *2 (D. Or. Mar. 4, 2010) (noting that the plaintiff stated a claim for breach of contract against all defendants although the factual allegations in the complaint indicated that only one defendant was a party to the agreement).

### g.   Constructive Trust

Plaintiff also asserts a cause of action for a constructive trust.  (Dkt. No. 1 ¶¶ 93-94.) However, just as with Plaintiff's "claim for relief" for conversion, a constructive trust is an equitable remedy, not a cause of action.  *See Mattel v. MGA Entm't, Inc.*, 616 F.3d 904, 908-09 (9th Cir. 2010); *Swanson v. Alza Corp.*, No. C 12-4579 PJH, 2013 WL 968275, at *13 (N.D. Cal. Mar. 12, 2013) (citations omitted); *Haskell Eng'g & Supply Co. v. Hartford Acc. & Indem. Co.*, 78 Cal. App. 3d 371, 375 (1978).  A party may request imposition of a constructive trust as a remedy sought in a different cause of action, but it is not a standalone claim.  *See Yagman*, 2013 WL 1287409, at *3.  The Court therefore recommends dismissing this cause of action.

---

[4] Notably, such a contract does not fall under California's statute of frauds and, therefore, is enforceable in the absence of a formal written agreement.  *See* Cal. Civ. Code § 1624.

United States District Court
Northern District of California

United States District Court
Northern District of California

1          h.      RICO Counts

2       Plaintiffs next two counts assert that Defendants' conduct violated provisions of the

3  Racketeering Influenced Corrupt Organizations ("RICO") Act, 18 U.S.C. §§ 1961-1968.  (Dkt.

4  No. 1 ¶¶ 95-115.)  Plaintiff first alleges a violation of 18 U.S.C. § 1962(c).  The elements of such a

5  claim are as follows:  "(1) conduct; (2) of an enterprise; (3) through a pattern; (4) of racketeering

6  activity (known as 'predicate acts'); (5) causing injury to plaintiff's business or property."

7  *Grimmett v. Brown*, 75 F.3d 506, 510 (9th Cir. 1996) (citing 18 U.S.C. §§ 1964(c), 1962(c)).

8  Courts must strictly enforce pleading requirements when plaintiffs seek default judgments under

9  RICO.  *Alan Neuman Prods., Inc. v. Albright*, 862 F.2d 1388, 1392 (9th Cir. 1988) (citation

10  omitted); *Falk v. Allen*, 739 F.2d 461, 463 (9th Cir. 1984) (per curiam).  Applying Rule 9(b)'s

11  particularity requirements to RICO claims, courts have required Plaintiffs to plead the "time, place

12  and nature" of the claims, including the existence of the enterprise and the underlying racketeering

13  activity.  *Sophia v. Myicis*, No. C 07-02364 SI, 2008 WL 5411479, at *2 (N.D. Cal. Dec. 29,

14  2008) (adopting report and recommendation of magistrate judge).

15       The statute defines "enterprise" as "any individual, partnership, corporation, association, or

16  other legal entity, and any union or group of individuals associated in fact although not a legal

17  entity."  *Living Designs, Inc. v. E.I. DuPont de Nemours & Co.*, 431 F.3d 353, 361 (9th Cir. 2005).

18  An "association in fact" is "a group of persons associated together for a common purpose of

19  engaging in a course of conduct."  *Odom v. Microsoft Corp.*, 486 F.3d 541, 552 (9th Cir. 2007)

20  (citation omitted).  To establish an association-in-fact enterprise, a plaintiff must allege that there

21  is an "ongoing organization," whether formal or informal, and that the "various associates function

22  as a continuing unit."  *Id.* (citation omitted).  Here, Plaintiff's complaint sufficiently alleges that

23  since 2010 two of the Individual Defendants (Saliba and Dinardo) worked together formally under

24  the umbrella of their company, Centurion, with the purpose of defrauding Plaintiff, and that the

25  remaining Individual Defendant (Witt) joined this association-in-fact enterprise in 2013.  Thus,

26  this prong of a civil RICO claim is sufficiently alleged.

27       With respond to the next prong, in the Ninth Circuit, a "pattern" of racketeering activity

28  requires "two or more acts that constitute offenses, conspiracies, or attempts of the requisite type,

as long as the defendant committed two of the acts and both of them were connected by common scheme, plan, or motive." *United States v. Brooklier*, 685 F.2d 1208, 1222 (9th Cir. 1982), *cert. denied*, 459 U.S. 1206 (1983); *see also Miller v. Glen & Helen Aircraft, Inc.*, 777 F.2d 496, 498 (9th Cir. 1985) (a pattern is "at least two acts that are sufficiently related"). The statutory definition of "racketeering activity" is any act indictable under certain enumerated federal criminal statutes, including 18 U.S.C. § 1341 (mail fraud) and 18 U.S.C. § 1343 (wire fraud). *See* 18 U.S.C. § 1961(1)(B). To allege a violation of the mail fraud statute, a plaintiff must plead facts sufficient to make a plausible showing that (1) the defendants formed a scheme or artifice to defraud; (2) the defendants used the mail or caused a use of the United States mails in furtherance of the scheme; and (3) the defendants did so with the specific intent to deceive or defraud. *United States v. Green*, 745 F.2d 1205, 1207-08 (9th Cir. 1985), *cert. denied*, 474 U.S. 925 (1985). Similarly, wire fraud consists of (1) the formation of a scheme or artifice to defraud; (2) use of the United States wires or causing a use of the United States wires in furtherance of the scheme; and (3) specific intent to deceive or defraud. *United States v. Louderman*, 576 F.2d 1383, 1387-88 & n.3 (9th Cir. 1978), *cert. denied*, 439 U.S. 896 (1978). The complaint must include allegations that specifically recount the particular details of the use of telephones for wire fraud. *See Schreiber Distr. Co.*, 806 F.2d at 1401.

Importantly, to state a civil RICO claim, the allegations in the complaint must establish the "threat of continuing activity" as opposed to a mere "isolated event." *Schreiber Distrib. Co. v. Serv-Well Furniture Co.*, 806 F.2d 1393, 1399 (9th Cir. 1986) (citing *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 496 n.14 (1985)). For example, in *Schrieber*, the Ninth Circuit upheld dismissal of plaintiff's Civil RICO claim for failure to state a claim because the complaint only "alleged the fraudulent diversion of a single shipment" of the plaintiff's products, which "did not meet the requirement of a showing of 'continuity plus relationship which combines to produce a pattern." *Id.* To satisfy this continuity requirement, Plaintiffs must either plead "a series of related predicates extending over a period of time[, *i.e.*, close-ended continuity], or past conduct that by its nature projects into the future with a threat of repetition[, *i.e.*, open-ended continuity]." *Howard v. Am. Online Inc.*, 208 F.3d 741, 750 (9th Cir. 2000) (internal quotation marks and

United States District Court
Northern District of California

United States District Court
Northern District of California

1    citations omitted).  "Predicate acts extending over a few weeks or months and threatening no

2    future criminal conduct do not satisfy [the continuity] requirement."  *Id.* (citation omitted).  Courts

3    in the Ninth Circuit consider a number of factors when determining whether a plaintiff has pled

4    sufficiently a close-ended continuous RICO claim, including:  "(1) the number and variety of

5    predicate acts; (2) the presence of separate schemes; (3) the number of victims; and (4) the

6    occurrence of distinct injuries."  *NSI Tech. Servs. Corp. v. Nat'l Aeronautics & Space Admin.*, No.

7    95-20559 SW, 1996 WL 263646, at *3 (N.D. Cal. Apr. 13, 1996) (citations omitted).  Importantly,

8    "[a] single plan with a singular purpose and effect does not constitute a 'pattern' of racketeering

9    activity."  *Id.* (citation omitted); *see also Buran Equip. Co. v. Hydro Elec. Constructors*, 656 F.

10   Supp. 864, 866 (N.D. Cal. 1987) (finding no civil RICO violation where "all of the alleged

11   offenses in this case related to one commercial transaction and involve a single victim and a single

12   injury").

13       Here, while the complaint is replete with examples of the Individual Defendants' use of the

14   telephone and mail in furtherance of the alleged scheme to defraud Plaintiff (*see, e.g.*, Dkt. No. 1

15   ¶¶ 30-39 (Saliba used the telephone to induce Plaintiff to engage in the allegedly fraudulent

16   transactions); *id.* ¶ 37 (Saliba caused Plaintiff to use the mail to ship the Replacement Coins to

17   Dublin); *id.* ¶ 39 (Saliba used the mail to ship the Bait Coins); *id.* ¶ 32 (Witt used the telephone to

18   falsely assuage Plaintiff's concerns in order to perpetrate the fraud); *id.* ¶ 18 (Dinardo shipped the

19   Replacement Coins to Plaintiff).  Thus, the complaint adequately alleges predicate acts.

20       With respect to continuity, the complaint contains only the following allegation:  "Plaintiff

21   is also informed and believes that the defendants have perpetrated similar bait-and-switch schemes

22   with rare and valuable coins with other third parties in the past."  (Dkt. No. 1 ¶ 60; *see also id.*

23   ¶ 106 (same (contending that "defendants have engaged in similar fraudulent schemes to those

24   describes herein against other third[ ]parties using the same or similar methods or means" such

25   that Defendants' conduct "threatens a continued harm").) [5]  These allegations are fatal to

26   _____

27   [5] The declarations filed in support of Plaintiff's motion for default judgment contain allegations
     identifying another individual who reportedly fell victim to Defendants' numismatics scheme, and
28   noted that the FBI and Postal Inspector have also begun investigations into Defendants' activities.
     (Dkt. No. 59-2 ¶ 12.)  However, these allegations do not appear in the complaint, and in the

Plaintiff's RICO claims, however, because "[a]llegations based on 'information and belief' do not satisfy the particularity requirement of Fed. R. Civ. P. 9(b) unless the complaint sets forth the facts upon which the belief is founded [. . .] even when the fraud relates to matters peculiarly within the knowledge of the opposing party." *In re Worlds of Wonder Sec. Litig.*, 694 F. Supp. 1427, 1432-33 (N.D. Cal. 1988); *see also Aizuss v. Commonwealth Equity Trust*, 847 F. Supp. 1482, 1488 (E.D. Cal. 1993) (dismissing complaint where some elements of RICO claim were alleged "on information and belief" for failure to comply with Rule 9(b)).  Aside from these allegations "on information and belief" regarding other incidents of fraud against other victims, Plaintiff's complaint merely alleges *one* scheme involving *one* victim relating, at bottom, to *one* transaction; such is not the stuff as RICO claims are made on.  *See Pajarillo v. Bank of America*, No. 10CV937 DMS (JMA), 2010 WL 4392551, at *7 (S.D. Cal. Oct. 28, 2010) (dismissing civil RICO claim for failure to plead the existence of a pattern of racketeering activity where plaintiffs alleged on information and belief that defendants engaged in "more instances of racketeering activity involving different victims but utilizing the same method, means, mode, operation and enterprise").

Because Plaintiff has not properly pled the elements of a substantive RICO offense, his RICO conspiracy claim fails as well.  *Salinas v. United States*, 522 U.S. 52, 65 (1997); *Howard*, 208 F.3d at 751 (affirming dismissal of the plaintiffs' RICO conspiracy claims after they failed to allege a pattern of RICO activity under § 1962(c)).  Accordingly, because Plaintiff's complaint does not state a claim for civil RICO violations, the Court recommends declining to grant default judgment on these causes of action.

---

context of a default, the court considers only the allegations in the complaint to support claims of RICO violations, and considers outside declarations and other evidence solely with respect to damages.  *See Danning v. Lavine*, 572 F.2d 1386 (9th Cir. 1978) (noting that the first two *Eitel* factors regarding the sufficiency and merits of the complaint require that a plaintiff adequately plead each cause of action in the complaint itself); *Cripps v. Life Ins. Co. of N. Am.*, 980 F.2d 1261, 1267 (9th Cir. 1992) ("[N]ecessary facts not contained in the pleadings . . . are not established by default."); *but see Patton v. Prober & Raphael, a Law Corp.*, No. 11-cv-1458 PJH (NC), 2012 WL 294537, at *4 (N.D. Cal. Jan. 13, 2012) (summarily concluding that the complaint was sufficient for purposes of default after considering the complaint, the motion for default, and accompanying declarations); *Autodesk, Inc. v. Flores*, No.10-cv-01917-LHK, 2011 WL 337836, at *3 (N.D. Cal. Jan. 31, 2011) (same).

United States District Court
Northern District of California

j.      Unfair Business Practices

Finally, Plaintiff asserts a claim under state law for acts of unfair competition in violation of California Business and Professions Code § 17200.  (Dkt. No. 1 ¶¶ 116-121.)  A Section 17200 claim may be brought by "any person who has suffered injury in fact and has lost money or property as a result" of unlawful, unfair or fraudulent business activities.  Cal. Bus. & Prof. Code § 17204.  "Relief is limited to injunctive relief and restitution; damages are not available under the unfair competition law."  *Parrish v. Nat'l Football League Players Ass'n*, 534 F. Supp. 2d 1081, 1090 (N.D. Cal. 2007) (citations omitted).  The statute defines "unfair competition" as "any unlawful, unfair or fraudulent business act or practice."  Cal. Bus. & Prof. Code § 17200.  The statute establishes three alternative theories for finding unlawful conduct—unlawful, unfair or deceptive, and fraudulent—and a plaintiff need only allege one such theory to state a claim.  *Parrish*, 534 F. Supp. 2d at 1090 (citing *Cel-Tech Commc'ns, Inc. v. Los Angeles Cellular Tel. Co.*, 20 Cal. 4th 163, 180 (1999).  It is well established that "a misleading statement" in the course of business transactions "is an unfair business practice" sufficient to state a claim under Section 17200.  *Ariz. Cartridge Remanufacturers Ass'n, Inc. v. Lexmark Int'l, Inc.*, 290 F. Supp. 2d 1034, 1041 (N.D. Cal. 2003).

Unlawful business practice includes anything that is a business practice but is also forbidden by law.  *iYogi Holding Pvt. Ltd. v. Secure Remote Support, Inc.*, No. C-11-0592 CW, 2011 WL 6291793, at *13 (N.D. Cal. Oct. 25, 2011) (citation omitted).  Unfair business practice refers to any practice whose harm outweighs any benefits.  *Id.*  "The court must weigh the utility of the defendant's conduct against the gravity of the harm to the alleged victim."  *Id.* (quoting *Gafcon, Inc. v. Ponsor & Assoc.*, 98 Cal. App. 4th 1338, 1425 n.15 (2002)).  Finally, fraudulent business practice requires a showing that members of the public are likely to be deceived by defendants' conduct, but allegations of actual deception are unnecessary.  *Id.*

Here, plaintiff has alleged that Defendants made numerous misrepresentations about the value and grading of the Replacement Coins and about their promise to help Plaintiff sell the coins or retrieve their represented value.  Because Plaintiff has adequately pleaded these misrepresentations as discussed above, he has stated a claim under Section 17200.  *See, e.g., iYogi*

*Holding*, 2011 WL 6291793, at *13; *Ariz. Cartridge Remanufacturers Ass'n*, 290 F. Supp. 2d at 1041.  Thus, the Court recommends granting default judgment to Plaintiff on this count.

### 4.    Sum of Money at Stake

The fourth *Eitel* factor balances the amount of money at stake in the claim with the seriousness of the defendant's conduct.  *Eitel*, 782 F.2d at 1471-72.  In this case, the amount of money at stake—$434,500—is not disproportionate to the seriousness of Defendants' conduct.  Moreover, the amount bears a reasonable relationship to Plaintiff's loss as evidenced through Plaintiff's valuation of his Original Collection (see Dkt. No. 59-1 ¶ 12), along with documentation of invoices between the parties.  *See Bd. of Trs. of the Cal. Metal Trades v.Pitchometer Propeller*, 984 F. Supp. 978, 978 (N.D. Cal. 1997) (granting default judgment where the amount at stake is reasonable, properly documented, and contractually justified).  Thus, this factor weighs in favor of default judgment.

### 5.    Possibility of Dispute Concerning Material Facts

The fifth *Eitel* factor considers the possibility that material facts may be in dispute.  *Eitel*, 782 F.2d at 1471-72.  According to the facts alleged in the complaint, on at least one occasion Defendant made statements conceding that some of the allegations were true:  Defendant Saliba agreed with Plaintiff that many of the Replacement Coins were of lesser value than Defendants initially held them out to be.  (Dkt. No. 1 ¶ 38.)  On the other hand, Defendant Witt filed a motion to dismiss, which suggests that he would take issue with the facts underlying Plaintiff's claims.  (*See* Dkt. No. 18.)  At bottom, however, because Defendants have not answered the complaint, and therefore the possibility of a dispute concerning material facts is unknown, this factor does not weigh for or against default.

### 6.    Excusable Neglect

The sixth *Eitel* factor considers whether the defendant's default may have been due to excusable neglect.  *Eitel*, 782 F.2d at 1471-72.  Here, Defendants were all properly served, and some even entered appearances in this matter.  Nevertheless, they have declined altogether to respond to Plaintiff's allegations.  Under the circumstances presented, their default does not appear to be due to excusable neglect, so this factor weighs in favor of default.

25

United States District Court
Northern District of California

### 7.    Policy Favoring Decision on the Merits

Finally, the seventh *Eitel* factor reflects the policy that generally disfavors default judgments because "cases should be decided upon their merits whenever reasonably possible." *Id.* at 1472.  Despite this general policy, "because a discretionary standard is applied, default judgments are more often granted than denied." *Webb v. Indigenous Global Dev. Corp.*, C-04-3174 MJJ, 2005 WL 1200203, at *5 (N.D. Cal. May 16, 2005) (internal quotation marks and citation omitted).  Although this factor weighs against default, it is not alone dispositive nor does it weigh substantially against granting default given the impossibility of deciding a case on its merits when defendant fails to answer. *See Willamette*, 2014 WL 5281039, at *13 (citation omitted).

Accordingly, a review of the *Eitel* factors in this case weighs in favor of granting default judgment on Plaintiff's claims for intentional misrepresentation—which is the same as fraud— negligent misrepresentation, breach of contract, conversion, and unfair business practices.

## III.    RELIEF

Having determined that the motion should be granted in part, the Court turns to the matter of the relief to which Plaintiff is entitled.  In his motion for default judgment, Plaintiff seeks monetary relief—in the form of compensatory damages and treble damages on his RICO claims— as well as equitable relief—in the form of a constructive trust and restitution.  In addition, Plaintiff seeks attorneys' fees and costs pursuant to the RICO Act.  (Dkt. No. 59 at 28.)

### A.    Money Damages

In his motion for default judgment, Plaintiff seeks $435,500 in actual, compensatory damages along with pre-judgment interest.[6]  The moving party has the burden to "prove up" the amount of damages. *United States v. Sundberg*, No. C-09-4085 EMC, 2011 WL 3667458, at *6 (N.D. Cal. Aug. 22, 2011) (citation omitted).  Where the amount of damages "is liquid or capable of ascertainment from definite figures contained in documentary evidence or detailed affidavits,

---

[6] Plaintiff appears to have withdrawn his request for punitive damages on the fraud claims. (*Compare* Dkt. No. 1 ¶ 71 (seeking punitive or exemplary damages), *with* Dkt. No. 59 at 28 (seeking $435,500 in actual damages "excluding exemplary damages" and making no other reference or request for punitive damages).)

26

1    the Court may enter default judgment without a hearing on damages." *Id.* (internal quotation

2    marks and citation omitted); *see also Pope v. United States*, 323 U.S. 1, 12 (1944) ("It is a familiar

3    practice and an exercise of judicial power for a court upon default, by taking evidence when

4    necessary or by computation from facts of record, to fix the amount which the plaintiff is entitled

5    to recover and to give judgment accordingly.").  Similarly, if the plaintiff can meet his burden of

6    proving an amount of damages "capable of mathematical calculation" through evidence,

7    testimony, or written affidavit, there is no need for an evidentiary hearing on damages.  *See Davis*

8    *v. Fendler*, 650 F.2d 1154, 1161 (9th Cir. 1981); *Bd. of Trs. of the Boilermaker Vacation Trust v.*

9    *Skelly, Inc.*, 389 F. Supp. 2d 1222, 1226 (N.D. Cal. 2005).

10        As a threshold matter, Plaintiff seeks compensatory damages as a remedy for tort claims

11   sounding in both contract and fraud.  "In an action involving both contract and fraud, the injured

12   party can affirm the contract and still sue for damages based on fraud."  *Kloepping v. Fireman's*

13   *Fund*, No. C 94-2684 TEH, 1996 WL 75314, at *5 (N.D. Cal. Feb. 13, 1996) (citing *Jue v. Smiser*,

14   23 Cal. App. 4th 312, 315 (1994)).  A party that is defrauded is entitled to recover out-of-pocket

15   losses, which are the difference between the actual value of what the person parted with and the

16   actual value of what they received.  Cal. Civ. Code §§ 3333, 3343; *Kloepping*, 1996 WL 75314, at

17   *5.  In contract claims, the plaintiff recovers the measure of damages caused by the defendant's

18   breach, *Lewis Jorge Constr. Mgmt., Inc. v. Pomona Unified Sch. Dist.*, 34 Cal. 4th 960, 971

19   (2004), and for conversion claims the plaintiff is similarly entitled to the value of the property of

20   the time of the conversion, *Spates v. Dameron Housing Ass'n*, 114 Cal. App. 4th 208, 221 (2003).

21   Each of these measures, Plaintiff contends, is equal to the value of the Original Collection plus the

22   Wire Transfer, which Defendants represented to be the value of the Replacement Coins, as well as

23   the Bait Coins that Plaintiff paid for that Defendants now possess.  However, Plaintiff may not

24   recover more in actual damages than the actual value of the property lost because the myriad

25   claims simply represent different theories that arise from the same harm—*i.e.*, the scheme to

26   defraud Plaintiff—and would give rise to impermissible double recovery.  *See Theme Promotions,*

27   *Inc. v. News Am. Mktg. FSI*, 546 F.3d 991, 1055 (9th Cir. 2008) (citations omitted); *Dodds v.*

28   *Bucknum*, 214 Cal. App. 4th 206, 212 (1963).

United States District Court
Northern District of California

27

1   Here, the Court concludes that Plaintiff has met his burden of proving the actual value of

2   his lost property.  First, Plaintiff has identified the value that he lost as a result of Defendants'

3   scheme based on the allegations in the complaint and in the Plaintiff's Declaration filed in support

4   of his motion for default.  (Dkt. No. 59-1.)  He seeks to recover the "represented December 2010

5   value" of the Replacement Coins, which he calculates as equal to the combined value of his

6   Original Collection plus the Wire Transfer he sent to Defendants and the cost of the Bait Coins,

7   which he returned to Defendants.  (*See* Dkt. No. 59 at 28; Dkt. No. 59-1 ¶¶ 19, 29 & Ex. 4.)

8   Plaintiff offers his own opinion regarding the value of his Original Collection.  (Dkt. No.

9   59-1 ¶ 12.)  Plaintiff offers his valuation of the collection "[b]ased upon the grades assigned to the

10  Original Collection by PCGS and NGC, available list prices from reputable numismatic

11  appraisers, and [his] own significant experience in selling and trading rare and valuable coins[.]"

12  (*Id.* ¶ 12.)  Indeed, Plaintiff's declaration waxes lyrical about his experience and knowledge in the

13  field of numismatics:  he avers that he has "been actively studying and collecting rare and valuable

14  coins since 1992" (*id.* ¶ 5); that his interest and experience in coin collection is not merely "a

15  casual or leisure pursuit" but rather an investment tool (*id.* ¶ 6); and that he had a "significant" and

16  "extensive" coin collection as of 2010 (*id.* ¶ 11).  Plaintiff further contends that he is familiar with

17  both the relevant factors in valuing—*i.e.*, "grading"—rare coins (including rarity, quality,

18  condition, and marketability) and with reputable third party grading services.  (*Id.* ¶ 8.)  Plaintiff

19  contends that his opinion is admissible under Federal Rule of Evidence 701, which makes

20  admissible lay opinion that is "(a) rationally based on the witness's perception; (b) helpful to

21  clearly understanding the witness's testimony or determining a fact at issue; and (c) not based on

22  scientific, technical, or other specialized knowledge within the scope of Rule 702."  Rule 702, in

23  turn, governs the opinion testimony of experts—*i.e.*, those who are "qualified as an expert by

24  knowledge, skill, experience, training, or education[.]"[7]  Courts generally permit the "owner *of a*

25  *business* to testify to the value or projected profits of the business, without the necessity of

26

27  _____

28  [7] Such a witness may offer expert testimony if it is helpful to the jury, based on sufficient facts, the product of reliable methods reliably applied, and the expert has reliably applied the principles to the facts of the case."  Fed. R. Evid. 702.

qualifying the witness as an accountant, appraiser, or similar expert." Advisory Comm. Notes to

Fed. R. Evid. 701 (emphasis added) (citing *Lightning Lube, Inc. v. Witco Corp.*, 4 F.3d 1153 (3d

Cir. 1993)).  Following this proposition, Plaintiff seeks to admit his own testimony regarding the

value of his personal property—the Original Collection of rare coins—as lay testimony under Rule

701, not expert testimony under Rule 702.  (*See* Dkt. No. 59.)

Other courts have expressly found that a plaintiff-owner of a stolen coin collection may

provide lay opinion testimony regarding the value of the collection where the opinion was based

on, among other things, appraisals received from various collectors and personal experience as the

owner of the collection, even when estimating a value is really at heart technical and scientific.

*Neff v. Kehoe*, 708 F.2d 639, 643-44 (11th Cir. 1983); *United States v. Laughlin*, 804 F.2d 1336,

1339-41 (5th Cir. 1986); *United States v. McGinnis*, 783 F.2d 755, 757 (8th Cir. 1986).  So it is

here, where Plaintiff's lay opinion as to the market value of his property is based on appraisers'

list prices and over two decades of experience in coin collecting.

According to Plaintiff, the Original Collection was worth $296,645 in 2010 when he

entered into the fraudulent transaction with Defendants.  (Dkt. No. 59-1 ¶ 12.)  In addition,

Plaintiff avers that he delivered a total cash amount of $137,805 to Defendants as part of the

scheme; this total includes $8,805 for the four Bait Coins, which Plaintiff actually received but

sent back to Defendants for the purposes of resale; and the $129,000 wire transfer that was part of

the Replacement Coins transaction.  (*Id.* ¶ 29.)  Defendants have returned neither these items nor

their equivalent value.  Accordingly, whether framed as actual damages for fraud, conversion, or

negligent misrepresentation, Plaintiff is entitled to $435,500 in actual damages.

Accordingly, the Court finds that Plaintiff is entitled to $435,500 in actual, compensatory

damages—the represented value of the Replacement Coins that Plaintiff has lost due to

Defendants' fraud.[8]

---

[8] The Court does not recommend awarding punitive damages.  Although Plaintiff appeared to seek punitive damages in his complaint (*see, e.g.*, Dkt. No. 1 ¶ 71), he did not seek such damages in his motion for default judgment.  (*Compare* Dkt. No. 1 ¶ 71, *with* Dkt. No. 59 at 28-29.)

United States District Court
Northern District of California

United States District Court
Northern District of California

1

**B.      Prejudgment Interest**

2

In addition, Plaintiff seeks prejudgment interest on these actual damages.  (Dkt. No. 59 at

3

29; Dkt. No. 66.)  Under California law, prejudgment interest is governed by Civil Code section

4

3287 and is recoverable in any action in which damages are certain or "capable of being made

5

certain by calculation" and the right to recover such damages is vested in the plaintiff on a

6

particular day.  Cal. Civ. Code § 3287(a); *see also Cortez v. Purolator Air Filtration Prods. Co.*,

7

23 Cal. 4th 163, 174-75 (2000).  The test for determining "certainty" under section 3287(a) is

8

whether the defendant actually knows the amount owed or could have computed the amount from

9

reasonably available information.  *Children's Hosp. & Med. Ctr. v. Bonta*, 97 Cal. App. 4th 740,

10

774 (2002).  Thus, because the amount of damages on Plaintiff's claims is certain, he is eligible to

11

receive pre-judgment interest.  However, the decision to award prejudgment interest is within the

12

Court's discretion.  *Alexander v. Incway Corp.*, No. CV 11-8851 (DSF) (VBKx), 2013 WL

13

5603932, at *21 (C.D. Cal. Oct. 11, 2013) (citing Cal. Civ. Code § 3288).

14

Plaintiff makes two proposals with respect to the amount of prejudgment interest:  one

15

seeking interest at 10% per year, the rate at which California law assesses contract claims, and one

16

at 7% per year, the statutory rate for fraud claims.  (*See* Dkt. No. 66 ¶¶ 8-9.)  Although the Court

17

recommends entering judgment for Plaintiff on a breach of contract claim, at bottom, the

18

gravamen of Plaintiff's claims sound in fraud.  Thus, the lower 7% rate is appropriate.  *See* Cal.

19

Const., Art. XV, § 1; *Michelson v. Hamada*, 29 Cal. App. 4th 1566, 1585 (1994).  Per Plaintiff's

20

calculations, which the Court finds reasonable and accurate, prejudgment interest at this rate is

21

$163,708.70, based on interest accruing from the June 2010 initial shipment of property to

22

Defendants—when the fraud began—up until January 22, 2015—the date of this report and

23

recommendation and the now-vacated date of the hearing set for this matter.[9]  The Court finds this

24

to be a reasonable and appropriate amount and recommends awarding this prejudgment interest to

25

Plaintiff.

26

27

─────────────────────

[9] Plaintiff only seeks prejudgment interest on the value of the Original Collection and Wire

28

Transfer sent to Defendants in May 2010.  (Dkt. No. 66 ¶ 5.)

30

1     Accordingly, the Court recommends entering judgment for Plaintiff in the amount of

2   $589,353.70.[10]

3       **B.      Attorneys' Fees and Costs**

4     Finally, Plaintiff seeks attorneys' fees and costs of suit.  (Dkt. No. 59 at 29.)  As the only

5   claims to which Plaintiff has obtained judgment are California state claims, the Court must apply

6   California law when assessing the availability of attorneys' fees and costs of suit.  *Kona Enters.,*

7   *Inc. v. Estate of Bishop*, 229 F.3d 877, 883 (9th Cir. 2000).  Under California law, "a prevailing

8   party is entitled as a matter of right to recover costs in any action or proceeding."  Cal. Code Civ.

9   P. § 1032(b).  Section 1033.5 lists the costs that are allowable, noting that attorneys' fees are only

10  allowed when otherwise authorized by contract, statute, or law.  *Id.* § 1033.5(10).  Thus, "the

11  general rule is that attorneys' fees are not a proper item of recovery from the adverse party, either

12  as costs, damages or otherwise, unless there is express statutory authority or contractual liability

13  therefor."  *Haines v. Parra*, 193 Cal. App. 3d 1553, 1559 (1987) (citations omitted).  No exception

14  to the general rule is present here:  there are no allegations that the parties contractually agreed to

15  compensate each other, and no other statute or law provides for attorneys' fees on Plaintiffs'

16  claims.  *See Prentice v. No. Am. Title Guar. Corp.*, 59 Cal. 2d 618, 620 (1963) (in a fraud action,

17  the plaintiff may not generally recover attorneys' fees); *Haines*, 193 Cal. App. 3d at 1559 (in a

18  conversion action, the party may not recover attorneys' fees); *Walker v. Countrywide Home*

19  *Loans, Inc.*, 98 Cal. App. 4th 1158, 1159 (2002) (unfair competition law does not provide for

20  attorneys' fees).  Accordingly, the Court recommends awarding Plaintiff the costs of suit as set

21  forth in Section 1033.5, but not awarding attorneys' fees.

22                                **CONCLUSION**

23     For the foregoing reasons, the Court recommends granting default judgment on Plaintiff's

24  claims for intentional and negligent misrepresentation, breach of contract, conversion, and unfair

25

26  _____

[10] To the extent that Plaintiff's causes of action for constructive trust and unjust enrichment seek

27  these equitable remedies for the other causes of action in the complaint, the Court recommends
    declining to award these equitable remedies.  Where equitable remedies and damages cover the
    same loss, the plaintiff generally must elect to recover one or the other.  *See Dang v. Sutter's*

28  *Place, Inc.*, No. C-10-02181 RMW, 2013 WL 5955561, at *2 (N.D. Cal. Oct. 28, 2013).

United States District Court
Northern District of California

business practices and denying default judgment on Plaintiff's claims for RICO violations, constructive trust, money had and received, and unjust enrichment.  The Court further recommends that judgment be entered in Plaintiff's favor in the amount of $589,353.70 in actual damages and prejudgment interest along with costs of suit.

Plaintiff shall serve a copy of this report and recommendation on Defendants Witt, Saliba, and Dublin Rarities within three business days from the filing date of this report and recommendation and shall file a proof of service with this Court.  Any party may file objections to this report and recommendation with the district court judge within 14 days after being served with a copy.  *See* 28 U.S.C. § 636(b)(1)(B); Fed. R. Civ. P. 72(b); Civ. L.R. 72-3.  Failure to file objections within the specified time may waive the right to appeal the district court's ultimate Order.

**IT IS SO ORDERED**.

Dated:  January 22, 2015

JACQUELINE SCOTT CORLEY
United States Magistrate Judge